IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BARBARA SUE THOMAS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-14-3287 |
| | § | |
| CAROLYN W. COLVIN, ACTING | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER DENYING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND GRANTING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Before the Magistrate Judge[1] in this social security appeal is Plaintiff's Motion for

Summary Judgment and Memorandum in Support thereof (Document No.10), Defendant's

Response to Plaintiff's Motion for Summary Judgment (Document No.13), Defendant's Motion

for Summary Judgment (Document No. 11) and Memorandum in Support thereof (Document

No.12). After considering the cross motions for summary judgment, the administrative record,

and the applicable law, the Magistrate Judge ORDERS, for the reasons set forth below, that

Defendant's Motion for Summary Judgment (Document No. 11) is GRANTED, Plaintiff's

Motion for Summary Judgment (Document No. 10) is DENIED, and the decision of the

Commissioner is AFFIRMED.

---

[1] The parties consented to proceed before the undersigned Magistrate Judge on April 1, 2015.
(Document No. 8).

## I.    Introduction

Plaintiff Barbara Sue Thomas ("Thomas") brings this action pursuant to the Social Security Act ("Act"), 42 U.S.C. § 405 (g), seeking judicial review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her applications for disability insurance benefits ("DIS") and supplemental security income ("SSI"). Thomas argues that evidence does not support the Administrative Law Judge's ("ALJ") decision, and the ALJ, Gerald Meyer, committed errors of law when he found that Thomas was not disabled. Thomas argues that she has been disabled since July 1, 2009, due to mental problems. According to Thomas, the ALJ failed to consider the Thomas's obsessive-compulsive disorder, and failed to call a Medical Expert to testify or obtain a consultative examination, and instead acted as a physician in the case in making his residual functional capacity ("RFC") assessment. Thomas seeks an order reversing the ALJ's decision and awarding benefits, or in the alternative remanding her claim for further consideration, with instructions to order a Mental Health Expert to appear and testify regarding all of Thomas's psychiatric limitations. The Commissioner responds that Thomas was not disabled, that the decision comports with applicable law, that the ALJ did consider all credible evidence, and that the decision should, therefore, be affirmed.

## II.    Administrative Proceedings

On January 30, 2013, Thomas applied for disability insurance benefits and SSI, claiming an inability to work since July 1, 2009. The Social Security Administration denied her application at the initial and reconsideration stages. After that, Thomas requested a hearing before an ALJ. The Social Security Administration granted her request and the ALJ, Gerald

Meyer, held a hearing on February 5, 2014, at which Thomas's claims were considered *de novo.*
On May 12, 2014, the ALJ issued a decision finding Thomas not disabled. (Tr. 20-31).

Thomas sought review of the ALJ's adverse decision with the Appeals Council.  The
Appeals Council will grant a request to review an ALJ's decision if any of the following
circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an
error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's
actions, findings or conclusions; or (4) a broad policy issue may affect the public interest.  20
C.F.R. § 404.970; 20 C.F.R. § 416. 1470. The Appeals Council concluded there was no basis
upon which to grant Nelson's request for review.  After the denial, the ALJ's findings and
decision became final.

Thomas has filed a timely appeal of the ALJ's decision.  Both the Commissioner and
Thomas have filed motion for Summary Judgment (Document Nos. 10 & 11).  This appeal is
now ripe for ruling.


III.    **Standard for Review of Agency Decision**

The court, in its review of a denial of disability benefits,  is only "to [determine] (1)
whether substantial evidence supports the Commissioner's decision, and (2) whether the
Commissioner's decision comports with relevant legal standards."  *Jones v. Apfel*, 174 F.3d 692,
693 (5th Cir. 1999).  Indeed, Title 42, Section 405(g) limits judicial review of the
Commissioner's decision as follows: "[t]he findings of  the Commissioner of Social Security as
to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  The
Act specifically grants the district court the power to enter judgment, upon the pleadings, and
transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social

Security with or without remanding the case for a rehearing" when not supported by substantial

evidence.  *Id.*  While it is incumbent upon the court to examine the record in its entirety to decide

whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the

court may not "reweigh the evidence in the record nor try the issues *de novo*, nor substitute its

judgment" for that of the Commissioner even if the evidence preponderates against the

Commissioner's decision.  *Chaparro v. Bowen*, 815 F.2d 1008, 1009 (5th Cir. 1987); *see also*

*Jones* at 693; *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985).  Conflicts in the evidence are

for the Commissioner to resolve.  *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act,

to be "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co.*

*v. N.L.R.B.,* 305 U.S. 197, 229 (1938)).  Substantial evidence is "more than a scintilla and less

than a preponderance."  *Spellman v. Shalala,* 1 F.3d 357, 360 (5th Cir. 1993).  The evidence must

create more than "a suspicion of the existence of the fact to be established, but no 'substantial

evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no

contrary medical evidence.'"  *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983) (quoting

*Hemphill v. Weinberger*, 483 F.2d 1127 (5th Cir. 1973)).

IV.     **Burden of Proof**

An individual claiming entitlement to disability insurance benefits under the Act has the

burden of proving his disability.  *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988).  The Act

defines disability as the "inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death

or which has lasted or can be expected to last for a continuous period of not less than twelve

months." 42 U.S.C. § 423(d)(1)(A).  The impairment must be proven through medically

accepted clinical and laboratory diagnostic techniques. 42 U.S.C.  § 423(d)(3).  The impairment

must be so severe as to limit the claimant in the following manner:

> [H]e is not only unable to do his previous work but cannot, considering his age,
> education, and work experience, engage in any other kind of substantial gainful
> work which exists in the national economy, regardless of whether such work
> exists in the immediate area in which he lives, or whether a specific job vacancy
> exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).  The mere presence of an impairment is not enough to establish that

one is suffering from a disability.  Rather, a claimant is disabled only if he is "incapable of

engaging in any substantial gainful activity."  *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir.

1992) (quoting *Milan v. Bowen*, 782 F.2d 1284 (5th Cir. 1986)).

> The Commissioner applies a five-step sequential process to determine disability status:
>
> 1.  If the claimant is presently working, a finding of "not disabled" must be made;
>
> 2. If the claimant does not have a "severe" impairment or combination of
> impairments, he will not be found disabled;
>
> 3.  If the claimant has an impairment that meets or equals an impairment listed in
> Appendix 1 of the Regulations, disability is presumed and benefits  are awarded;
>
> 4.  If the claimant is capable of performing past relevant work, a finding of "not
> disabled" must be made; and
>
> 5.  If  the claimant's impairment prevents him from doing any other substantial
> gainful activity, taking into consideration his age, education, past work
> experience, and residual functional capacity, he will be found disabled.

*Anthony,*  954 F.2d at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren*

*v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991).  Under this formula, the claimant bears the burden

of proof on the first four steps of the analysis to establish that a disability exists.  If successful,

the burden shifts to the Commissioner, at step five, to show that the claimant can perform other

work. *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999).  Once the Commissioner

demonstrates that other jobs are available, the burden shifts, again, to the claimant to rebut this

finding.  *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990).  If, at any step in the process, the

Commissioner determines that the claimant is or is not disabled, the evaluation ends.  *Leggett*, 67

F.3d at 563.

   In the instant action, the ALJ determined that Thomas had not engaged in gainful activity

since July 1, 2009 (Step 1). The ALJ determined that Thomas has the following medically

determinable and severe impairments: disorder of the spine; affective disorder; anxiety disorder;

and somatoform disorder (Step 2), but that none of the impairments met or equaled an

impairment listed in Appendix 1 of the Regulations (Step 3); that Thomas had the RFC to lift or

carry 10 pounds frequently and 20 pounds occasionally; stand or walk 6 hours in an 8-hour

workday with normal breaks; sit 6 hours in an 8-hour workday with normal breaks; and push or

pull 10 pounds frequently and 20 pounds occasionally. The ALJ further found that Thomas could

not perform work at unprotected heights or around dangerous machinery. As for non-external

limitations, that Thomas was "limited to understanding, remembering, and carrying out simple 1-

2-3 step tasks that are routine and repetitive without frequent changes in duties," and "includes

occasional contact with workers or the public." (Tr. 26). The ALJ found that Thomas could not

perform any past relevant work (Step 4). The ALJ further found that based on Thomas's RFC

and the testimony of a vocational expert,that Thomas could perform work as a mail clerk, a

photocopy machine operator, and as an office worker as was not disabled within the meaning of

the Act (Step 5).  As a result, the undersigned must determine whether substantial evidence

supports the ALJ's Step 5 finding. In this regard, Thomas maintains that the ALJ failed to

properly weigh the medical evidence, particularly the opinions of private consultative examiner

Dr. Whitley and the claimant's obsessive compulsive disorder ("OCD").

In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating, examining and consultative physicians on subsidiary questions of fact; (3) subjective evidence as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history, and present age.  *Wren*, 925 F.2d at 126.

V.   **Discussion**

   **A. Objective Medical Evidence**

The objective medical evidence shows that Thomas suffers from a severe combination of impairments, including affective disorder; anxiety disorder; and somatoform disorder.

On December 2011, Thomas underwent hernia surgery, and later reported uric acid buildup and gastrointestinal ulcer due to this surgery. (Tr. 342). Thomas underwent a gastric bypass in May 2011, with some complications due to an allergic reaction caused by the surgical tape. *Id*. However, there was no abdominal abnormality shown by a May 2013 diagnostic CT scan. (Tr. 344)*.* Thomas was given Lortab and became physiologically dependent in May of 2011 until February of 2012. (Tr. 342).

On September 7, 2011, Thomas was diagnosed by Tri-County MHMR Services with obsessive-compulsive disorder, panic disorder without agoraphobia, and generalized anxiety disorder. (Tr. 375). She was prescribed Xanax for her symptoms. Thomas then returned to to Tri-County MHMR Services on October 5, 2011. *Id.* During her evaluation, Thomas reported that she had attempted numerous anti-depressants, mood stabilizers, and anti-anxiety medications throughout her life. *Id.* Her self- reported symptoms included irritability without trigger, excessive anger, panic attacks, difficulty breathing, easily startled, easily overwhelmed, excessive

worry, and anxiety "all her life." *Id.* She reported that she "must count her steps, must buy certain things in even numbers," and, "compulsively picks at her skin." *Id.*

On October 05, 2011, Dr. Laura Champagne evaluated Thomas and recommended she begin weekly counseling to improve coping with anxiety triggers and resolve trauma. Thomas was unwilling to attend counseling unless she had a medical appointment scheduled, due to financial and transportation limitations. Thomas wanted to take medications only to improve functioning. Her GAF was 50. (Tr. 386).

Thomas was diagnosed with posttraumatic stress disorder ("PTSD") on December 5, 2011, by Tri-County MHMR Services. (Tr. 431). Thomas had an outpatient clinic visit on December 22, 2011. (Tr. 455). The treatment note shows Thomas was suffering from major depression, though non-psychotic, and was not taking her medications as prescribed since her last visit. *Id.* Thomas reported that anxiety was the greatest concern for her, and that it was the trigger for her depression. (Tr. 457). She further reported that anti-depressants had been prescribed for her in the past, but had only been effective for a week, and was hesitant to continue to take medications, though she was willing to try Pristiq for her depression. *Id.*

During her outpatient clinic visit on February 24, 2012, Thomas reported to Dr. Ashok Vachhani that she continued to have anxiety, which caused her to be depressed. (Tr. 408). Dr. Vachhani reported Thomas as cooperative, and he opined that Thomas did not have bipolar I, though no mood stabilizers she had tried were working. *Id.* Thomas stated that the Xanax helped her feel better. *Id.*

During a psychological evaluation completed on April 18, 2012, by Dr. Jim Whitley Ed.D, Thomas reported a history of anxiety, depression, and PTSD. Dr. Whitley administered the Millon Clinical Multiaxial Inventory-III ("MCMI-III") test, with an interpretive report using

Grossman Facet Scales. During the examination, Thomas's speech was of consistent with her educational achievement and concomitant for testing and conversation, coherent and relevant, and of adequate flow. (Tr. 344). Her memory was intact, as was her attention and ability to concentrate, which was tested by counting from one to ten, then backwards from 20 to zero, and reciting all the days of the week. *Id.* The MCMI-III indicated that Thomas had a generalized anxiety disorder, which suggested that she experiences severe levels of anxiety, and her State-Trait Anxiety Inventory score indicated that had significantly elevated levels of anxiety during the examination. The test, under the Axis I, suggested that she suffered from a major depressive disorder, severe episode without psychoses, PTSD, panic disorder without agoraphobia, and excessive compulsive disorder. (Tr. 346). The test's diagnostic impressive suggested a high level of PTSD, somatization disorder, panic disorder without agoraphobia, generalized anxiety disorder, obsessive compulsive disorder, and mood disorder due to depression. (Tr. 347). Dr. Whitley opined that "the prognosis for the patient being able to function independently at a full time job forty hours a week is mute. It is believed that she could profit from the benefits that would be offered through SSI." (Tr. 348). Dr. Whitely noted that Thomas's condition has been ongoing for a protracted period of time, and there has not been any relief from the medical issues even though she has undergone surgery on several occasions. *Id.* He further noted that she has very significant issues associated with posttraumatic stress. *Id.* In his report, Dr. Whitley does not specifically mention OCD. (Tr. 346-348).

During her visit with the Tri-County Services' Pharmacological Management on August 8, 2012, Thomas claimed she was "a lot better," though Ambien was making her sleep walk, but she found that she was becoming depressed. (Tr. 449). She claimed having suicidal ruminations, but no plans. *Id.* She reported using Melatonin and Vistaril to sleep. *Id.*

On May 13, 2012, Thomas stated in her initial psychiatric evaluation that she didn't "want to be alive anymore." She stated that she had "been depressed since she was a little girl," and "tried lots of meds for her depression." (Tr. 369). However, she also stated that has had no full blown panic attacks since she started taking Xanax. She stated that she was going to kill herself with either a concoction of pills or a gun, but decided to call 911 instead. (Tr. 369). Thomas stated that she has frequent thoughts of suicide, but would "never do it." (Tr. 375). Thomas reported feeling "numb" and "suicidal." (Tr. 433). On May 14, 2012, Thomas reported feeling in better spirits and had no suicidal thoughts, but was having fantasies that she felt were not normal, and that she was slipping away from reality. (Tr. 433, 429). She also noted that side effects of her medications had caused her to lose sleep. *Id.* By May 16, 2012, she reported feeling "the best she had in ten years." (Tr. 322) She was cooperative and helpful. *Id.*  She also reported having struggled with life long depression and mood cycling, which would cause her to become a "total maniac" and flip furniture and have high energy. (Tr. 434). She was discharged on May 18, 2012. When she checked back on May 31, 2012 with Dr. Kenneth Winaker, she reported that she was doing okay, not depressed, and was using Benadryl instead of Vistaril. (Tr. 443). During her brief Bipolar Disorder Symptom Scale exam with Tri County it was found that not one of the symptoms of bipolar were present in Thomas. (Tr. 448).

On January 3, 2013, Dr. Sneed reported that Thomas was making progress, and using less Vistaril. (Tr. 392) She reported as being in a nice mood and affect, and sleeping better than in the past. *Id*. She was well groomed, and there were no suicidal ideations. *Id.* She was in the "acceptance step," and appeared to be stable. *Id.* Her memory, attention and concentration were all intact. *Id.* She was taking Tegretol 200 mg, and Vistaril 100 mg, along with Xanax, TMZ,

Nexium, Tramadol, Metoprolol, and Lisinopril.(Tr. 396-398). There was no evidence of bi-polar disorder symptoms at the time of the evaluation. (Tr. 403).

By March 12, 2013, Thomas reported that she was doing great, but that the generic Tegretol "did not make her feel good", and raised the dosage on her own with no change in her drastic mood swings. (Tr. 415). The Brief Bipolar Disorder Symptom Scale found that she only had mild anxiety and depression. (Tr. 426).

On April 9, 2013, Dr. Matthew Wong, a disability determination unit physician, determined that Thomas was somewhat limited by psychologically based symptoms, but the impact of these symptoms did not wholly compromise the ability to function independently, appropriately, and effectively on a sustained basis. Alleged limitations are not wholly supported by Evidence on Record.  (Tr. 98). The "evidence does not establish the presence of anxiety related or affective disorder." *Id.* Further, the claimant's statements about her symptoms were considered to be partially credible when considered with the total medical and non-medical evidence on file. *Id.* "The alleged limitations caused by the claimant's symptoms are partially supported by the medical records." *Id.*

Thomas's Mental Residual Functional Capacity Assessment shows Thomas to be markedly limited in two categories: in her ability to understand and remember detailed instructions, and the ability to carry out detailed instructions. (Tr. 99-101). She was moderately limited in her ability to maintain attention and concentration for extended periods, the ability to work in coordination with or in proximity to others without being distracted by them, the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, the ability to interact appropriately with the general public, and the ability to respond

appropriately to changes in the work setting. *Id.*  Thomas was not significantly limited in the ability to remember locations and owrk-like procedures, the ability to understand and remember very short and simple instructions, the ability to carry out very short and simple instructions, the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, the ability to sustain an ordinary routine without special supervision, the ability to make simple work-related decisions, the ability to ask simple questions or request assistance, the ability to accept instructions and respond appropriately to criticism from supervisors, the ability to get along with coworkers or peers without distracting them or exhibiting behavorial extremes, the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, the ability to be aware of normal hazards and take appropriate precausitons, the ability to travel in unfamiliar places or use public transporation, and the ability to set realistic goals or make plans independently of others. Ultimately, it was found that Thomas was able to understand, remember, and carry out only simple instructions, make decisions, and concentrate for extended periods and interact adequately with coworkers and supervisors and respond appropriately to changes in a routine work setting. *Id.*

Here, substantial evidence supports the ALJ's findings that, while Thomas's impairments could be considered severe at Step Two, the impairments did not meet or equal in severity a listed impairment at Step Three. The ALJ discussed Thomas's OCD in connection with her anxiety-related disorders, and in doing so did not err.  Additionally, substantial evidence supports the ALJ's RFC determination.  The ALJ took into account Thomas's physical and mental limitations in formulating her RFC and gave specific reasons in support of this determination. This factor weighs in favor of the ALJ's decision.

**B. Diagnosis and Expert Opinion**

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact.  Unless good cause is shown to the contrary, "the opinion, diagnosis and medical evidence of the treating physician, especially when the consultation has been over a considerable length of time, should be accorded considerable weight."  *Perez v. Shweiker*, 653 F.2d 997, 10001 (5th Cir. 1981); *see also Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) ("The opinion of the treating physician who is familiar with the claimant's impairments, treatments and responses should be accorded great weight in determining disability.").  In addition, a specialist's opinion is generally to be accorded more weight than a non-specialist's opinion.  *Paul v. Shalala, 29* F.3d 208, 211 (5th Cir. 1990).  For the ALJ to give deference to a medical opinion, however, the opinion must be more than conclusory and must be supported by clinical and laboratory findings.  *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Oldham v. Schweiker,* 660 F.2d 1078, 1084 (5th Cir. 1981).  Further, regardless of the opinions, diagnoses, and medical sources, ""the ALJ has sole responsibility for determining a claimant's disability status.""  *Martinez v. Chater,* 64 F.3d 172, 176 (5th Cir. 1995) (quoting *Moore,* 919 F.2d at 905).

With respect to the opinions of treating physicians and medical sources, in light of testimony offered by Thomas and her mother, the ALJ wrote:

During the hearing, the claimant testified to the following:

> She has a GED.  She attempted some college but did  not pass the courses.  She was doing assembly work for Hewlett Packard in 2006 or 2007, putting servers together.  She tried to work a couple of times since 2009 but could not work more than a day or two each time.  She is bipolar and has PTSD, anxiety with panic attacks, and she is obsessive/compulsive.  Her back hurts from top to bottom and her foot hurts.  She does not sleep well and has sleep

apnea.  She does not like dealing with stupid people and often gets into arguments.  She isolates herself and does not trust anyone. She does not visit with friends or talk to her neighbors.  She spends most of her time sitting in her living room due to her physical problems.  She does not bathe regularly.  She has PTSD because she caught her dad in two "holdups" of convenience stores when she was a little girl.  She does not get along with her children.  She likes everything in even numbers.  She buys two of everything because an odd number is evil.  She is a perfectionist.  She became anxious and had to go to the bathroom because she was nervous about coming to the hearing.  She does not drive anymore because she had panic attacks while driving.  She has panic attacks once each month.  She hyperventilates and her chest hurts when this occurs.  Anything can make her panic, like not getting somewhere on time.  Her mother is stupid because she does not drive fast enough.  She is exhausted and tired most of the time.  She is able to stand for5 minutes at one time before her back and feet hurt. She cannot walk far or bend.  She cannot stoop or crouch because it hurts too bad.  She falls down every couple of months.  She could not lift or pull more than 10 pounds.  She is not able to remember what she reads.  She has no energy and never finishes anything.  She does not see her daughter or son.  She does not do housework but her mom does it for her.  She does not cook but grocery shops with her mom.  She attempts to do laundry.  She receives visits from a Tri-County caseworker 3-4 times each month.  This helps.  She has pain throughout her entire body.  She constantly changes positions.  She is unable to focus or pay attention.  She has always been a stay-at-home mom but was forced to work in the past because her ex-husband was not paying child support.  She has two adult disabled kids.  Her daughter lives with her but is never there.  She gets payments for her daughter but not her son.  She has not talked to him since he kicked her door in last October.  She is unable to work.

Diane Goff, the claimant's mother, testified to the following during the hearing:

She lives about 5 miles away from her daughter.  She sees the claimant on her days off.  Her daughter is very panicky.  The claimant does not leave the house unless she takes her grocery shopping or to the doctor.  Her daughter does not get along with her own children and is very stubborn.  The claimant sleeps in a lounge chair in her living room and won't get up and go to bed. She does yard work for the claimant.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the witness' statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

After complaints of seizures, the claimant had a negative brain MRI and EEG in January 2014 (Exhibit 14-F, pages 5-7). A seizure disorder is not a medically determinable impairment in this case since there is not diagnosis based on clinical and diagnostic evidence. Further, the claimant's brain function is normal as determined by the diagnostic evidence.

In terms of back problems, an abdominal CT scan taken in May 2013 showed disc narrowing with arthritis and possibly canal stenosis at the L4-S1 levels (Exhibit 13-F, page 6). It is noted that this test was performed in response to complaints of abdominal pain and did not target the claimant's spine. In fact, the claimant did not make sufficient reports of back pain that any diagnostic testing was performed on her spine. Moreover, the claimant had full, normal range of motion in May 2013 with normal strength (Exhibit 14-F, pages 14-16). As well, she demonstrated normal gait in January 2014 (Exhibit 14-F, pages 14-16). In combination with the claimant's non-severe impairments, she is limited to non-mental restrictions contained in the residual functional capacity evaluation but the evidence does not support more. Greater limitation would be expected to be associated with the course of regular treatment in addition to abnormal gait, limited range of motion, and seeking enough treatment that diagnostic testing would have been performed. In addition, it is noted that the claimant has been diagnosed with a somatoform disorder, which makes the clinical evaluation and diagnostic testing regarding physical problems even more important (Exhibit 1-F, page *).

Regarding mental problems, the claimant reported that the has had mental problems all of her life (Exhibit 10-F, page 4). She indicated that her parents were "pill poppers" and that her deceased sister physically and sexually abused her as a child (Exhibit 1-F, page 5). As well, the claimant reported taking a variety of psychotropic drugs most of her life and she indicated in October 2011 that she had taken her son's prescribed medication (Exhibit 2-F, pages 13 and 22). As well, the medical records reflect a prescription for Panax for anxiety from her primary care physician (Exhibits 3-F, page 208; and 9-F, pages 4 and 8). In fact, the

claimant indicated Panax "really works" in March 2011 (Exhibit
10-F, page 17).

When she sought treatment from a qualified mental health
professional, Tri-County MHMR, the claimant was diagnosed with
depression, PTSD, and anxiety-related disorders in 2011 (Exhibit
2-F, pages 1 and 25).  After clinical evaluation, the April 2012
private consultative examiner diagnosed the claimant with PTSD, a
mood disorder due to her medical condition, a somatoform
disorder, and an anxiety/panic disorder (Exhibit 1-F, page 8).
Unfortunately, the claimant refused continued services from Tri-
County MHMR in February 2012 and would not even meet with
this source (Exhibit 2-F, page 2).  However, she admitted that her
anxiety responded well to prescribed Panax (Exhibit 2-F, page 2).
Additionally, the claimant did not have symptoms of a bipolar
disorder in May, August, or October 2012 (Exhibit 2-F, pages 86,
91-92, and 107).  There was no change clinically in January 2013
still had not symptoms on the bipolar disorder symptoms scale
(Exhibit 2-F, pages 39-41).  In March 2013, she reported
improvement with medication until her medication was changed to
a generic with no symptoms of a bipolar disorder at that time either
(Exhibit 2-F, pages 53 and 64).  The records were nearly identical
in May 2013 as well without symptoms on the bipolar scale
(Exhibit 6-F, pages 1, 10, and 12).  Further no acute psychiatric
conditions were noted during May 2013 treatment (Exhibit 7-F,
page 4).

Despite her allegations of severe difficulty getting along with
others, the claimant was cooperative and pleasant during the
August 2012 private consultative exam as well as during May 2013
treatment (Exhibits 1-F, page 4; and 7-F, page 4).  The claimant's
reports of significant improvement with medication and the clinical
evaluations that consistently fail to show severe symptoms are not
suggestive of limitation beyond that found by the undersigned.

As for the opinion evidence, the private consultative examiner
concluded that the claimant's ability to function at a full-time job
was "mute", noting that the claimant would benefit from
supplemental security income benefits (Exhibit 1-F, page 9).
However, this finding on the ultimate issue of disability is reserved
for the undersigned as the Commissioner's representative (20 CFR
404.1527(e) and 416.927(e)).  Further, this opinion is inconsistent
with the great weight of the treatment evidence and the record as a
whole, as outlined above.  Therefore, beyond the diagnosis, this
opinion is given little weight (SSR 96-6p).

In terms of global assessment functioning (GAF) scores, the private consultative examiner found a GAF of 45 and the claimant had a GAF 49 in May 2012 and 50 in October 2011 (Exhibits 1-F, pages 8-9, and 2-F, pages 5 and 23). These scores are reflective of moderate-serious limitation and although considered and given some weight, it is noted that the practice of mental health care has moved away from GAF scores with the implementation of the DSM V (SSRs 96-2p and 96-6p). Since they are consistent with the evidence as a whole, the opinions of the State Agency Consultants are given great weight (SSR 96-6p).

(Tr. 27-29). Upon this record, the ALJ's decision is a fair summary and characterization of the medical records. Given the proper discounting of the opinion of Dr. Whitely on the ultimate issue of disability, and the medical opinions which support the ALJ's RFC determination, the diagnosis and expert opinion factor also supports the ALJ's decision.

## C. Subjective Evidence

The third element considered is the subjective evidence of pain, including the claimant's testimony and corroboration by family and friends. Not all pain is disabling, and the fact that a claimant cannot work without some pain or discomfort will render him disabled. *Cook*, 750 F.2d at 395. The proper standard for evaluating pain is codified in the Social Security Disability Benefits Reform Act of 1884, 42 U.S.C. §423. The statute provides that allegations of pain do not constitute conclusive evidence of disability. There must be objective medical evidence showing the existence of a physical or mental impairment, which could reasonably be expected to cause the pain. Statements made by the individual or his physician as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence of the record. 42 U.S.C. § 423. "Pain constitute[s] a disabling condition under the act only when it is 'constant, unremitting, and wholly unresponsive to therapeutic treatment.'" *Selders v. Sullivan*, 914 F.2d 614, 618-19 (5th Cir. 1990)(citing *Harrell v. Bowen*, 862 F.2d 471, 480 (5th Cir. 1988)). Pain may also constitute a non-

exertional impairment which can limit the range of jobs a claimant would otherwise be able to perform. *See Scott v. Shalala*, 30 F.3d 33,35 (5th Cir. 1994). The Act requires this Court's findings to be deferential. The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALJ, who has the opportunity to observe the claimant. *Hames*, 707 F.2d at 166.

Thomas and her mother testified at the hearing. Thomas testified at the hearing before the ALJ that she stated that her conditions were "Bipolar I mixed with PTSD, OCD, anxiety disorder, panic attack disorder, and anxiety attack disorder." (Tr. 42). She also stated that she had "chronic back pain from top to the bottom," neuropathy in her left foot, so much so that she can't wear shoes, and has "severe hemmhroids." *Id.* She also claimed to suffer from insomnia and sleep apnea. *Id.* She claimed that her bipolar disorder affected her by causing her to feel that "people are stupid" and she didn't "like dealing with stupid people." (Tr. 43). She claimed that everytime she left her home she got into an argument or worse. *Id.* She also claimed that she does not trust anyone because "they can't be trusted." *Id.* She isolates herself and only leaves the house if she has an appointment, and she doesn't visit anyone or let anyone visit her; not even her neighbors. *Id.* Instead, she spends all her time in her living room, laying down on a chaise lounge, which she claims is due to her physical limitations. (Tr. 44).

She claims that her PTSD was the result of witnessing her father allegedly rob a 7Eleven, and that by witnessing these things throughout her life resulted in her having self-reported trust issues. (Tr. 44). She also claims to have suffered abuse as a child at the hands of her older, deceased sister. (Tr. 45). She claims her OCD manifests itself in her having to have things only in even numbers, that odd numbers represent "evil," and that she must buy things in twos. (Tr. 47). She claims to expect perfection in herself and everyone and everything, although she contradicts herself by saying that she

just gives up if she can't be perfect in an activity like cleaning the house. (Tr. 48).

When asked about her panic attacks, Thomas testified to having panic attacks when driving down the street, and that she no longer drives because of this. *Id.* She claims they make her aggravated and aggressive towards others. *Id.* During her panic attacks she claims to hyperventilate, to the point that it feels like "having a heart attack," which leaves her feeling exhausted, so much so that she sleeps the rest of the day. (Tr. 49).

Thomas testified that, in regards to physical activities, she can't stand for more than five minutes because her back hurts, her feet hurts, "everything hurts," and that she lays down after standing for a while. (Tr. 50). When asked about walking, she responded, "no, that ain't happening." *Id.* She testified that she couldn't bend over and pick up a piece of paper, or stoop or crouch, or take stairs, because "it hurts too bad." *Id.* She also claimed that she losses her balance and is dizzy, and that she "falls all the time," reporting at least falling six times in that year, due to side effects from her medications. *Id.* Thomas claims to be unable to push or pull with her feet because it "hurts real bad." (Tr. 52). She reported that she has physical pain in her entire body, mostly in the "mid to upper" part of her back, and left foot toward the knee, which constantly feels like a burning, knifing pain that she describes as "severe." (Tr. 59).

When discussing her concentration, Thomas testified that she was unable to remember anything she read, and that she often gives up on reading because she feels frustrated. *Id.* She also claimed she has a problem remembering things, and that she was easily distracted and unable to stay on task or focus. (Tr. 53). She reported that she can't sleep, has low energy and no stamina. *Id.* She doesn't do housework, because she gets distracted, and her mom does everything else for her, like gardening and grocery shopping. (Tr. 54).

Credibility determinations, such as made by the ALJ in connection with Thomas's testimony

about her limitations, are within the province of the ALJ to make.  *See Greenspan v. Shalala*, 38 F.3d

232,237 (5th Cir. 1994) ("In sum, the ALJ 'is entitled to determine the credibility of medical experts

as well as lay witnesses and weigh their opinions accordingly.'") (quoting *Scott v. Heckler*, 770 F.2d

482, 485 (5th Cir. 1985)), cert. denied, 514 U.S. 1120 (1995).  Because the ALJ made and supported

his credibility determination with references to medical evidence and Thomas's testimony about her

daily activities, and because the ALJ did not rely on any improper factors, the subjective evidence

factor also weighs in favor of the ALJ's decision.

### D.  Education, Work History, and Age

The fourth element considered is the claimant's educational background, work history and

present age.  A claimant will be determined to be disabled only if the claimant's physical or mental

impairments are of such severity that he is not only unable to do his previous work, but cannot,

considering his age, education, and work experience, engage in any other kind of substantial gainful

work which exists in the national economy.  42 U.S.C. § 423 (d)(2)(a).

The record shows that Thomas was 47 years old at the time of the administrative hearing, has

a GED, attempted some college but failed all of the courses, and has performed past relevant

assembly work for Hewlett Packard in 2007. (Tr. 39). Based on the ALJ's conclusion that Thomas

did not have exertional restrictions on his ability to work, despite having some non-exertional

restrictions, the ALJ questioned a vocational expert, Ms. Earl, about Thomas's ability to perform her

past relevant work as an electronics assembler.

> Q. Would you assume for me a person who could lift or carry about
> 10 pounds frequently or 20 pounds occasionally, stand and walk
> about six hours in an eight-hour day with normal breaks or sit for six.
> No ropes, ladders or scaffolding, no unprotected heights or dangerous
> machinery. Mentally would be limited to understanding, remember
> and carrying out simple instructions, just simple, one to three-step
> tasks that are routine and repetitive without frequent changes and

duties. Only occasional contact with the public or coworkers. Could such an individual do the past work that you described?

A. No, sir.

Q. If they're 46-years-old with a GED and the past work as you described, if you use those same limits would there be any other work in the region or national economy?

A. Yes, sir, there is. One example is a mail clerk, it's a light, unskilled level, the DOT code is 209.687-026, nationwide, 70,000 and 850 in the local Houston region. Second example is a photocopy machine operator, also at the light, unskilled level, the DOT code is 207.685-014, nationwide, 50,000 and 600 locally. And a third example is an office cleaner at the light, unskilled level, the DOT code is 323.687-014, nationwide, 300,000 and 3,000 locally.

(Tr. 63-64).

"A vocational expert is called to testify because of his familiarity with job requirements working conditions. 'The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Vaughn v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995)(quoting *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)).  It is well settled that a vocational expert's testimony, based on a properly phrased hypothetical question, constitutes substantial evidence. *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).

Given the ALJ's reliance on the vocational expert, lack supportive medical evidence, the ALJ's credibility determination relative to Thomas's testimony about her pain and limitations, and the properly posed hypothetical questions to the vocational expert based on functional limitations recognized by the ALJ, substantial evidence supports the ALJ's conclusion that Thomas is not disabled within the meaning of the Act. Thus, this factor also weighs in favor of the ALJ's decision.

**V.  Conclusion and Order**

Considering the record as a whole, the Court is of the opinion that the ALJ and the

Commissioner properly used the guidelines propounded by the Social Security Administration, which direct a finding that Thomas was not disabled within the meaning of the Act, that substantial evidence supports the ALJ's decision, and that the Commissioner's decision should be affirmed.  As such, it is

ORDERED that Plaintiff's Motion for Summary Judgment (Document No. 10), is DENIED, Defendant's Motion for Summary Judgment (Document No. 11) is GRANTED, and the decision of the Commissioner of Social Security is AFFIRMED.

Signed at Houston, Texas, this 14th day of August, 2015

Frances H. Stacy
United States Magistrate Judge